# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

Nine Electronic devices currently located at the
Wisconsin Department of Justice, Division of Criminal
Investigation, Milwaukee Office, 633 W. Wisconsin Ave,
Suite 803, Milwaukee, WI 53203, more fully described
in Attachment A

Case No. **19 - 862M (NJ)**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:
21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 1956(h),

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jay Novak, ATF Task Force

Officer _____

*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _____

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Nancy Joseph _____, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Jay Novak, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation (WI DOJ / DCI-1), and I am also a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). As an ATF Task Force Officer since 2018, I am empowered under federal law to make arrests for violations of federal criminal laws and I am also empowered to execute federal search warrants.

3. I have been employed by the WI DOJ / DCI-1 since 1992, assigned to the Narcotics Bureau during my entire tenure. As a deputized ATF task force officer, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

4. As a law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding

1

acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses that specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

5.     I have participated in many drug trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. In many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

6.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

7.     The property to be searched is described as follows:

2

a.      An Apple iPhone with silver back in a brown plastic case, hereinafter "**Device A**";

b.      An Apple iPhone with white face and rose-colored back with partially cracked screen, hereinafter "**Device B**";

c.      An Apple iPhone with silver back, hereinafter "**Device C**";

d.      An Apple iPhone with white face, pink-colored back in a brown plastic case, hereinafter "**Device D**";

e.      An Apple iPhone with red back in a black plastic case, hereinafter "**Device E**";

f.      An Apple iPhone in orange/pink case with cracked screen, hereinafter "**Device F**";

g.      A Black Dell Inspiron laptop, Model PP41L, Serial Number 7DR12K1, hereinafter "**Device G**";

h.      A Seagate portable external hard drive, Serial Number NA8JF50F, hereinafter "**Device H**"; and

i.      A white Apple iPad, hereinafter "**Device I**."

8.      **Devices A, B, C, D, E, F, G, H**, and **I**, collectively the "**Devices,**" are currently located at 633 W. Wisconsin Avenue, Suite 803, Milwaukee, Wisconsin, 53203.

9.      The applied-for warrant would authorize the forensic examination of the **Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

3

## PROBABLE CAUSE

### A.     Background of Drug Trafficking Investigation.

10.     I believe that the marijuana trafficking and money laundering activities of members of this group began on or before at least the beginning of 2016 based upon all investigative activities undertaken during the investigation. The investigative activities included, but are not limited to, confidential informant (CI) interviews, other witness interviews, telephone, banking, airline, car rental and other documentary analysis.

11.     In 2017, members of the Milwaukee, Wisconsin Police Department initiated an investigation into a large-scale marijuana drug trafficking organization (DTO) led by Josef K. Habib and others. Habib acquired large shipments of marijuana from out of state source(s), which Habib then distributed in the greater Milwaukee area. Habib was also identified as utilizing stash locations in the greater Milwaukee area, including in cities of Milwaukee and Greenfield, Wisconsin.

12.     On January 8, 2018, law enforcement was conducting surveillance at an identified stash location at 4100 W. Hillcrest Drive, apartment #207, in Greenfield and observed a vehicle known to be driven by Habib, a black Nissan Maxima, Wisconsin license 242LWL, parked in a visitor parking stall at 4100 W. Hillcrest Drive, near the garage for apartment #207. The overhead garage door on the attached garage for # 207 was fully open.

13.     Law enforcement subsequently observed a Toyota Highlander vehicle with VA license plates arrive and drive into the open garage for apartment #207. The garage door then immediately closed.

14.     Approximately 20 minutes later, law enforcement observed the overhead garage door open, and law enforcement observed a white male enter the driver's seat of the Toyota and

4

Habib standing in front of the Toyota. The Toyota began to reverse out of the garage to apartment #207 and drive from the area. Habib was then observed entering the Nissan Maxima and drove it into the garage for apartment #207, and the overhead door closed.

15.     Approximately 25 minutes later, the overhead door of the garage for apartment #207 again opened and the Nissan Maxima exited in reverse. Habib was observed to be the driver and sole occupant of the vehicle.

16.     A traffic stop was conducted of the Nissan Maxima, driven by Habib, directly outside the address at 4100 W. Hillcrest Drive. At this time, an odor of marijuana was detected emanating from the vehicle and a large black plastic garbage bag was observed on the rear passenger seat. The black plastic garbage bag was consistent with what law enforcement knew during the investigation that Habib utilized to transport quantities of marijuana. A search of the garbage bag revealed foil sealed packages each of which contained suspected marijuana.

17.     A complete search of the Nissan Maxima revealed a total of approximately 64 pounds of suspected marijuana within the trunk and rear passenger area of the vehicle. A field test conducted on the suspected marijuana was conducted with positive results for the presence of THC.

18.     On January 8, 2018, a stop was also conducted of the Toyota and a subsequent consent search was conducted, which revealed approximately 160 pounds of marijuana and in excess of $300,000 in U.S. currency.

19.     Search warrants were subsequently executed on January 8, 2018 at 4100 W. Hillcrest Drive, apartment #207, Greenfield, Wisconsin, and at the residence of Habib, located at 117 W. Walker Street, apartment #303, Milwaukee.

20. Law enforcement located and seized approximately 206 pounds of marijuana from 4100 W. Hillcrest Drive, apartment #207, in Greenfield. Additionally, law enforcement located and seized approximately 16 pounds of marijuana, in excess of $21,500 in U.S. currency, and a loaded .40 caliber pistol from 117 W. Walker Street, apartment #303. Also seized were items consistent with the packaging and distribution of controlled substances.

21. The majority of the marijuana seized was in mylar bags and vacuum-sealed bags, some within black plastic construction bags.

22. Rental documents obtained for the stash location at 4100 W. Hillcrest Drive revealed that it had been rented in 2017 by Fredric Birault, and an individual named Larry Peters was the contact name for Birault, with an email address contact of larrygoeshardaf@gmail.com. Larry Peters was subsequently determined to be an alias name of Lev Reys and the email address larrygoeshardaf@gmail.com was determined to be an email address for Lev Reys. The subscriber for utilities were in the name of Sydney Malkin.

23. Upon Habib moving to Milwaukee in approximately December 2016, Habib was identified as having resided at 814 E. Kilbourn Ave., Milwaukee. The utilities at the Kilbourn Ave. location were in the name of Robert Malkin. Habib resided there until February, 2017 when he moved to another stash location at 4250 S. Ravinia Dr., #103, Greenfield, Wisconsin.

24. Rental documents obtained for 4250 S. Ravinia Dr., #103, Greenfield, Wisconsin, located in the same apartment complex as 4100 W. Hillcrest Drive #207, revealed that the Ravinia Dr. location was rented by Robert Malkin in February 2017. For the rental application credit / income fields on the application, Malkin supplied copies of checking account statements of two accounts, both joint accounts in the names Robert Malkin and Sydney Malkin, who was determined to be his daughter. One account mailing address was 226 W. Ojai Ave, #101, Ojai,

6

California, and the other listed an address 3639 W. Harbor Blvd., #201, Ventura, California. The insurance for the apartment rental was under the names Robert Malkin and Sydney Malkin, with an address of 226 W. Ojai Ave., #101, Ojai, California. Robert Malkin paid the monthly rent of $1130 for this stash location in money orders. The utilities at the Ravinia Dr. location were in the name of Sydney Malkin.

25.     Rental documents obtained for the residence of Josef Habib, 114 W. Walker Street, Milwaukee revealed that the apartment had been rented by Corianne Markowski, the girlfriend of Josef Habib, in April 2017. In the rental application, Markowski listed her employment since 2012 as Malkin Properties, 3639 W. Harbor Blvd., #201, Ventura, California. Robert Malkin was listed as Markowski's supervisor with a contact telephone number of 805-279-5393, a number known to be utilized by Robert Malkin. Markowski also listed her previous residence as an address known by law enforcement through database checks as a residence known to be owned by Malkin Properties in West Mifflin, Pennsylvania.

26.     In January 2018, a confidential informant (CI-1) began cooperating in the continuing investigation into the DTO. CI-1 provided information about the membership, structure, and customs of the interstate marijuana DTO emanating in California. CI-1's information has been corroborated by information obtained from various pubic databases, documents obtained during the investigation, asset and ownership records, law enforcement records, physical observations, and reviews of recorded jail calls. Such information will be detailed below. CI-1's information has never been found to be false or misleading. CI-1 has no criminal record and is receiving consideration in connection with a pending drug case from the United States Attorney's Office for his/her cooperation with law enforcement. CI-1 has also

7

received monetary compensation in the form of covered expenses in exchange for CI-1's cooperation with law enforcement. For these reasons, I consider CI-1 to be reliable.

27. CI-1 identified Robert Malkin as obtaining in excess of 1000-pound quantities of marijuana in California, which were subsequently transported by semi-tractor trailer to a location in Maryland. Parts of the shipments were then distributed to various locations in the U.S., including Virginia / Washington D.C. areas; Pittsburgh, Pennsylvania; North Carolina; and Milwaukee, Wisconsin. CI-1 further stated Robert Malkin operated a property management company and is suspected of laundering drug proceeds through the company by purchasing properties.

28. The semi-tractor trailer shipments of marijuana were off loaded from hidden compartments in the trailer at a hangar in Hagerstown, Maryland with quantities then transported for re-packaging and distribution at a stash house in Germantown, Maryland. In November 2017, CI-1 was recruited to move into and reside at the stash location in Germantown, Maryland and was responsible for oversight of the shipments of marijuana upon their arrival in Maryland by keeping accurate counts of the weights of marijuana that were shipped to the hangar and processed at the stash house. CI-1 was also responsible for collecting large quantities of currency from various coconspirators as payment by the coconspirators for quantities of marijuana they obtained from the shipments and had subsequently distributed. The money was also processed and packaged at the stash house and kept at a rented storage location in Gaithersburg, Maryland. Upon the semi-tractor trailer being readied for return to California the quantities of money were then transported to the hangar and secreted in the hidden compartments in the semi-tractor trailer and driven to California.

29. CI-1 met an individual identified as Lev Reys through a mutual associate Fredric Birault, both of whom CI-1 knew to reside in California. Birault had advised CI-1 that Reys was

8

looking for someone to assist in the organization's interstate marijuana trafficking organization and oversee the marijuana stash and off load locations in Maryland, and Reys would pay the individual for those duties. Birault stated he declined the offer as Birault did not wish to move to Maryland. CI-1 was recruited by Reys for this role and Reys had advised CI-1 that a coconspirator named "Scotty," subsequently identified by law enforcement as Scott Jungwirth, had occupied the Maryland stash house just before CI-1. Reys stated Jungwirth had the same duties as CI-1, but Jungwirth no longer occupied the stash house because Jungwirth had a quantity of marijuana shipped or delivered to the stash house. Having the marijuana shipped to the stash house was against the rules of the organization of keeping the location secret from any mailings or knowledge of who occupied the stash house to maintain the integrity of the organization's use of the location as a stash house.

30.     CI-1 identified Josef Habib as a Milwaukee based distributor for the group. CI-1 had obtained large quantities of U.S. currency from Habib, which CI-1 then transported back to Maryland.

31.     CI-1 identified Lev Reys as a close associate of Robert Malkin. CI-1 stated Reys' role in the organization was overseeing transportation of the shipments of marijuana from California to Maryland and other locations. CI-1 stated Reys has told CI-1 that Reys' goal is to accumulate numerous properties in the Pittsburgh, Pennsylvania area utilizing marijuana distribution proceeds and then accumulate further wealth through ownership and rental of the properties.

32.     CI-1 identified Jonah Dusi as a close associate of Robert Malkin who distributes large quantities of Malkin's marijuana shipments in the Pittsburgh, PA area. CI-1 identified Dusi's residence as 2624 Monterey Dr., Pittsburgh, PA. CI-1 also identified Chelsea E. Coleman as the

9

believed to be the wife of Dusi. In sum, Robert Malkin owns the residence; however, Malkin does not claim the property as a homestead.

33.     CI-1 identified an individual named Seth, subsequently identified as Seth Jacobs, as a main Maryland / Virginia based distributor for the organization who frequented the stash house in Maryland and oversaw a daily worker at the stash house named Ben, subsequently identified as Benjamin Rubin. CI-1 stated Rubin was responsible for repackaging the marijuana at the stash location for subsequent distribution and packaging of currency for shipment back to California.

34.     CI-1 also identified an individual named Ala / LA subsequently identified as Alae Arbi, and an individual named Nash, subsequently identified as Nahom Hagos, as individuals that frequented the stash house in Germantown, Maryland and obtained multi-pound quantities of marijuana weekly, which Arbi and Hagos sold in the Maryland / Virginia / Washington D.C. areas.

35.     CI-1 identified CI-1's two cellular telephone numbers. CI-1 also stated that a cellular telephone that CI-1 had left at the stash house in Maryland had been provided to CI-1 by Lev Reys in November 2017 as a cellular telephone number to utilize for contacting coconspirators in the organization. CI-1 had changed cellular telephones due to issues with service.

36.     CI-1 learned of the overall organization and understood the hierarchy of the organization to be Robert Malkin as the head person in charge / the financier and paid for the marijuana. Dusi was the Pittsburgh area distributor and also oversaw shipments of marijuana from Malkin and currency shipments back to Malkin. Jacobs was similar in status to Dusi in Jacobs' role as a main distributor/overseer of the Virginia/Maryland/D.C. areas. Reys was in charge of the transportation of the marijuana from California to Maryland and other locales. Rubin worked at the stash house in Germantown, Maryland, repackaging the shipments of marijuana and packaging

10

money that was to be shipped to California. Hagos and Arbi sold quantities of the shipments in the Maryland / Alexandria, Virginia and Washington, D.C. areas.

37.     After CI-1 moved to the stash house in Germantown, Maryland just before Thanksgiving 2017, Reys took CI-1 shopping for house supplies and food at a Wal-Mart near Germantown. A day or two later, Reys and CI-1 went to CubeSmart in Gaithersburg where an interior storage unit, #4030, was rented. Reys had CI-1 put the rental in CI-1's name, and Reys paid for the rental. Reys then purchased a Rigid steel construction bin and Reys and CI-1 transported it to the CubeSmart and put it in the storage unit. Reys provided CI-1 with spare keys for the storage unit lock and two padlocks that he put on the construction bin.

38.     The storage unit and bin were used for the storing of money, prior to it being taken to the hangar and loaded into the semi-trailers for transport to California. CI-1 had met Habib twice prior to the day of Habib's arrest. The first time occurred when Jacobs and Reys directed CI-1 to fly to Milwaukee. CI-1 flew to Milwaukee on Southwest Airlines from Baltimore and CI-1 rented a car, believed to be from Enterprise. CI-1 was directed to contact and meet with "Joe" and CI-1 subsequently met Habib by Hamburger Mary's in Milwaukee. Habib delivered money to CI-1 and Habib was driving a black car.

39.     After meeting Habib in Milwaukee, CI-1 was directed to drive to Pittsburgh to meet Dusi at a mall. A co-conspirator provided CI-1 with Dusi's phone number. CI-1 met Dusi by a Macy's store at a mall in Pittsburgh. Dusi walked up to CI-1's car with Chelsea Coleman and they stated that they were Christmas shopping for their kids. Dusi instructed CI-1 to open the hatch of CI-1's rental vehicle, and Dusi put a shopping bag in the rear hatch area. CI-1 believed that the bag contained cash. After buying a piece of luggage at Macy's to better secrete both bags of cash, CI-1 returned to the stash house in Germantown, Maryland with the money.

11

40.    CI-1 possessed a receipt, which CI-1 provided to law enforcement, dated November 25, 2017 for the Macy's store in Pittsburgh where CI-1 purchased the luggage.

41.    The second time CI-1 saw Habib took place sometime in what CI-1 believed was late December 2017 when Habib was at the stash house on Spring Meadows Dr., in Germantown, Maryland. CI-1 did not know why Habib was there, but he had come upstairs to the main living area.

42.    CI-1 stated on the day of Habib's arrest, CI-1 was directed by Reys to stop at another stash location in Milwaukee, which CI-1 identified as 7992 N. 107th Street, #6, Milwaukee. Reys had given CI-1 a set of keys for the apartment prior to CI-1 leaving Germantown, Maryland. CI-1 was directed to take the marijuana from the 107th Street location and deliver it to Habib, which CI-1 did. CI-1 estimated there was approximately 300 pounds of marijuana in the stash house on 107th Street.

43.    CI-1 then took the marijuana to Habib at the 4100 W. Hillcrest Dr. location and Habib took approximately 140 pounds of the marijuana but left CI-1 with the remaining amount. Habib also put the bags and boxes containing the US currency in the Highlander for CI-1 to take back to Maryland.

44.    CI-1 did not know what to do with the marijuana as CI-1 had never driven marijuana that had already been delivered to another city back to the Maryland stash house. CI-1 attempted to contact Jacobs and Reys via the Telegram app they utilized on their cellphones, but neither answered.

45.    CI-1 was in charge of the inventory of the bags in the hanger and upon obtaining quantities, CI-1 would reseal and renumber the bags with the current accurate count of the bags /

12

pounds. The marijuana was packaged in mylar bags and vacuum-sealed bags inside black plastic construction bags.

46.　　The semi-trailers had hidden compartments within them. One contained what appeared to be lumber stacks, but the lumber stacks were hollowed out on the inside with the top layer hinged so that the entire compartment could be accessed. The other trailer had a fake movie production set with equipment inside, men's and women's restrooms, generators, etc. If the rear trailer doors were accessed, a large generator was mounted there to deter someone from accessing the remainder of the trailer. CI-1 explained that to get to the front portion, a person had to crawl under the generator and over other equipment. A large steel Rigid construction bin was in the front portion of the trailer. The fake movie production set trailer was normally used for transporting the money from the sales of marijuana to California, hidden within the steel construction bin. The trailer with the fake lumber stacks would contain the marijuana shipped from California.

47.　　The truck drivers that hauled the trailers allegedly did not know they were transporting marijuana or money, and Reys stated that they would never use the same driver more than once.

48.　　Two locked large steel construction bins in the hangar were used for storage of quantities of marijuana when the trailers were picked up.

49.　　CI-1 observed approximately 30-40 black plastic construction bags within the fake lumber stacks and each construction bag normally contained 6-8 mylar bags, each of which generally contained 5 pounds of marijuana. CI-1 stated that the shipments from California contained approximately 1200-1600 pounds per shipment.

50.　　CI-1 was present at the hanger on approximately four occasions when semi-trailers were delivered or taken out and Reys was present on two occasions.

13

51.     On another occasion when CI-1 was at the hangar where the marijuana and cash was stored, Dusi arrived. Dusi said that another truck was coming. CI-1 told Dusi that the trailer in the hanger still had marijuana in it. Dusi said he had to call "Bob" (Robert Malkin) and went outside to place the call. After returning, Dusi reiterated that the truck was coming so CI-1 removed all of the packages of marijuana from the trailer in the hanger and put it in the two steel construction bins.

52.     CI-1 went to the hanger on approximately three other separate occasions alone with instructions from Jacobs to bring back to the Maryland stash house five to six contractor bags of marijuana each time.

53.     CI-1 also transported money from the stash house in Germantown, Maryland to the storage bin in the CubeSmart storage or to the storage bins at the hangar.

54.     Also during the time CI-1 worked for the organization, CI-1 was given three luggage/duffel bags and told to obtain all the money from the storage unit and bring it back to the stash house in Germantown, Maryland. CI-1 estimated that when filled with money each bag weighed about 50 pounds. CI-1 then observed Dusi come to the stash house and leave with the money filled bags. The next day, Dusi returned to the stash house with the bags, which were empty.

55.     CI-1 also stated that Malkin operated a property management company and was told by Reys that Malkin and Reys purchase properties with proceeds from their drug trafficking with the intention of using earnings from the properties for future income.

56.     On January 9, 2018, law enforcement from Montgomery County Sheriff's Department executed a search warrant at the stash house in Germantown, Maryland, based upon the information developed in this investigation. A search of the residence revealed evidence

14

consistent with the information provided by CI-1 as the location being a stash house for marijuana distribution: thousands of unused vacuum sealed bags, marijuana remnants, a money counter, latex gloves, and the cellular telephone identified by CI-1 as being at that location and having been provided to CI-1 by Reys. Law enforcement authorities also seized documents linking various coconspirators to the residence through banking receipts, billings, and handwritten notations.

57. CI-1 identified various telephone numbers and usernames of the coconspirators from an encrypted cellular telephone application called Telegram. The coconspirators utilized Telegram to contact one another to avoid detection from law enforcement as it was a cellphone app that enabled telephone numbers to be displayed when calling or texting and had a feature of "secret chat" that subsequently allowed either party to erase the conversations and call logging from both parties' phones. CI-1 stated that some of the usernames that the coconspirators utilized in the app were fictitious names that the various coconspirators had chosen. CI-1 stated all of the defendants that were known to CI-1 primarily only used the secret chat and voice calling on the Telegram app and did not use regular texting. CI-1 knew of Jacobs carrying 3 cellphones at a time and Reys having more than the one cellphone CI-1 was aware of.

58. Law enforcement reviewed the cellular telephone of CI-1 and the Telegram app on CI-1's cellular telephone. CI-1 identified the following names and Telegram app contacts: the name Jonah and telephone number 412-316-6966 as the number for Dusi; a name of Joe with a fictitious name of Steven Trace and username @Ralfy434, Telegram app telephone number 414-888-0646 as the contact information for Josef Habib; the name Larry Peters and username @LarryPeters, Telegram app telephone number 818-299-0267 as the contact information for Lev Reys; a name Alle with no Telegram telephone number saved as the username for Arbi; a name Ben with a fictitious name of @timwilliams (aka Paul Ramon) with no telephone number saved

15

as Rubin; the name Bob with username name BM with no telephone number saved as Robert Malkin; the name Seth with the fictitious username Rick Orozco as the username of Jacobs.

59. Outgoing calls were observed to the Telegram usernames of Reys and Jacobs during the time period after CI-1 left Habib's 4100 W. Hillcrest Dr. stash location on January 8, 2018.

60. The calls/ conversations with Dusi were deleted via secret chat.

61. There were also numerous secret chats between CI-1 and the other referenced user names.

62. Law enforcement authorities subpoenaed telephone number 412-316-6966. A review of the subpoenaed information revealed that the subscriber of record during this time period was Chelsea Coleman, with a listed address of 432 Lucy Dr., Pittsburgh. Dusi and Coleman both list 432 Lucy Drive as their residence on their Pennsylvania driver's licenses.

63. Also observed on CI-1's cellphone were numerous pictures time stamped December 21, 2017 of notebook pages containing handwritten notations of abbreviated names of marijuana strains with numbers next to the abbreviations. CI-1 stated that they were pictures taken by CI-1 that CI-1 then sent to Reys and Jacobs documenting the pounds of various types of marijuana that was remaining on that date at the hangar after CI-1 had been directed to go pick up a quantity of marijuana at the hangar and bring it back to the stash house in Germantown, Maryland.

64. On January 9, 2018, law enforcement conducted a consent search provided by CI-1 at 7992 N. 107th Street, #6, Milwaukee and observed that no one was residing in the apartment. Items observed and seized included plug in air fresheners, a box of rubber gloves, and loose

locksets for doors. The air fresheners were the same type as what was observed at the stash house at 4100 Hillcrest Dr., #207.

65. A review of Lev Reys' credit card accounts, including Citibank account statements, revealed that Reys had flown to Milwaukee from Los Angeles on September 19, 2017 and then from Milwaukee to Baltimore, MD on September 22, 2017. Reys then flew from Baltimore, MD to Los Angeles on September 23, 2017.

66. Reys then had charges from a Holiday Inn hotel and Home Depot store in the Milwaukee area on November 8 and 9, 2017. Records received from the Holiday Inn revealed Reys rented a room the night of November 8 into November 9, 2017. A review of the transaction receipt from Home Depot from November 9, 2017 revealed Reys had purchased various household cleaning items and supplies, including lockset(s), the same type of air fresheners observed at 4100 W. Hillcrest #207 and 7992 N. 107th Street, #6, and latex gloves. Surveillance video obtained from the Home Depot also revealed Reys making the purchase and driving from the Home Depot in a light colored newer minivan.

67. On January 25, 2018, law enforcement obtained search warrants from the Honorable Magistrate Judge William E. Duffin for the two cellular telephones of Habib, 414-888-1856 and 571-639-1582. A review of the telephones revealed contacts in Telegram with a name entered as Bdigi, telephone number 805-279-5393 (known to be the telephone number of Robert Malkin) in the Telegram app, and encrypted conversations between that number and Habib's cellular telephone. Additional Telegram usernames were Paul Ramon with username @Timwilliams (Identified by CI-1 as the individual Ben) with calls between the two.

68. There were also numerous chats and secret chats between Habib's cellphone and other unidentifiable usernames on the Telegram app. Some of the chats included pictures of

17

notebook pages containing handwritten drug ledgers, including various marijuana strains with numerical amounts and pages containing monetary amounts, including pages titled "Milw. Inventory" and D.C. Inventory with dollar amounts over $1,000,000. Some of these chats were with Paul Ramon.

69. Database checks on the telephone number 805-279-5393 revealed the telephone number is listed to Robert Malkin. Further records obtained via subpoena related to rental locations and banking and other records revealed Robert Malkin utilizing the telephone number 805-279-5393.

70. In January 2018, law enforcement traveled to Maryland with CI-1 and conducted follow-up investigative activities including consent searches at a CubeSmart storage unit in Gaithersburg, Maryland and the rented warehouse hangar in Hagerstown, Maryland. CI-1 identified the storage unit as having contained the Rigid steel construction bin purchased by Reys and put in the storage unit for securing currency from the organization's marijuana sales before the currency being shipped to California. CI-1 identified the warehouse hangar as the location where the semi tractor-trailers were brought to for off-loading of the shipments of marijuana.

71. Upon searching the storage unit, the special agents observed a padlocked Rigid steel construction bin inside the unit. A set of keys recovered from the stash house in Germantown, Maryland opened the locks on the bin, which was found to be empty.

72. Surveillance video received from CubeSmart showed Reys and CI-1 entering the storage unit in November 2017 on the day of the initial rental and a few days later, both are observed on video unloading the Rigid steel construction bin from the Toyota Highlander and taking it inside the storage unit.

18

73.     Upon searching the warehouse hangar, a tractor-trailer was observed parked inside and the interior of the trailer contained two false lumber and plywood stacks. The top layer of false lumber was hinged on each stack, which revealed hollowed out compartments, both of which were empty. There were also two additional Rigid steel construction bins in the warehouse hangar.

74.     A check on the California license plate on the trailer revealed that the trailer was registered to Fredric Birault, at 23907 Windward Lane, Valencia, CA.

75.     Law enforcement also conducted surveillance of 2624 Monterey Dr., Pittsburgh, PA with CI-1 during that week and observed parked in the driveway was a black Chevrolet SUV, license HTY6479 / PA. The vehicle was determined to be registered to Chelsea Erin Coleman and Jonah Michael Dusi, 2624 Monterey Dr. on a 2011 Chevrolet. S/A Novak approached the front door of the residence and observed a FedEx package on the front stoop by the front door addressed to Chelsea E. Coleman at 2624 Monterey Dr. Two children, who came from across the street, entered the front yard and S/A Novak asked who lived at the residence and the female child stated their two friends, who they went to school with, and identified their last name as Dusi. S/A Novak asked if they were home and she stated they were and that she would go to the back door. S/A Novak knocked on the front door and rang the doorbell but no one answered. After a short time, the female child returned and said she spoke to the father and told him someone was at their front door but he closed the window covering and told her to go away. A short time later, special agents observed the black Chevrolet vehicle being driven by Dusi leave the residence.

76.     Rental documents obtained for the stash house in Germantown, Maryland revealed that the residence was rented by Robert Malkin in July 2017. Rental documents for the warehouse hangar revealed that it was also rented by Robert Malkin in September 2017.

77. CI-2 was interviewed in early 2019. CI-2 served as a stash house worker in Maryland from June/July 2017, to November 2017, just prior to CI-1. CI-2, who is charged in a superseding indictment with conspiracy to distribute marijuana, gave a Mirandized statement upon CI-2's arrest, and subsequently debriefed during which CI-2 provided more detailed information.

78. CI-2 was recruited by Malkin to work at the stash house in Maryland and also to make pickups and deliveries of marijuana and money. CI-2 corroborated the details of the DTO as previously provided by CI-1.

79. CI-2 stated that Dusi was frequently at the hangar where the semi-trailers containing the marijuana and cash were stored. Together, CI-2 and Dusi built the false lumber compartments in the trailer used to transport marijuana from California to other destinations. CI-2 believed Dusi had a background in carpentry.

80. On one occasion, CI-2 was directed by Malkin to drive a shipment of money to Pittsburgh and deliver it to Dusi. CI-2 was provided the cellular number of Dusi and upon meeting with Dusi, CI-2 delivered the money to him. Dusi gave CI-2 two large garbage bags full of marijuana and directed CI-2 to deliver it to another subject in the Pittsburgh area. CI-2 subsequently met with a white male in an alley and delivered the marijuana to the male on behalf of Dusi.

81. At the time of CI-2's arrest, CI-2 was in possession of a cellular telephone which CI-2 identified as the one CI-2 used when working for the DTO. CI-2 gave consent to conduct a search of the cellular telephone and observed in the contents was the Telegram app with Bob M, telephone number 808-279-5393, and contacts of "Jonah, Pennsylvania" with telephone number 412-316-6966. CI-2 identified Bob M as the contact for Robert Malkin and Jonah as the contact for Jonah Dusi.

20

82. During the week of July 25, 2018, law enforcement executed the arrest warrants issued by the U.S. District Court, Eastern District of Wisconsin for Robert J. Malkin, Jason J. Malkin, Lev B. Reys, Fredric H. Birault, Seth C. Jacobs, Alae Arhi, Nahom Hagos, Mohammed E. Omar and also executed search warrants at their respective residences and other locations connected to the defendants in the multiple districts. Items seized as a result of the warrants included large volumes of boxes of documents, including, but not limited to: incriminating banking records and other financial information; asset ownership documents; ledgers and bills; incriminating handwritten notations linking the coconspirators; travel records; approximately 50 cellular phones and other electronic devices; and, the seizure of over $2,000,000 in cash and cash equivalents.

83. During a follow up search warrant executed in Ventura, California, the two semi-trailers described by CI-1 and CI-2, including the one law enforcement observed inside the hangar during the consent search in January 2018 containing the hidden compartment lumber stacks, were found parked at the storage location. The hidden compartment lumber stacks were dismantled. The second semi-trailer, described as a movie set, was observed to be equipped in the manner CI-1 and CI-2 had described but the contents had also been dismantled. Also located was another vehicle pull behind type trailer identified as belonging to Robert Malkin, which contained a large electric vacuum heat sealer, empty vacuum seal bags and some bags with initials on them, consistent with strains of marijuana. The same strain names were observed on the photographs on the cellular telephone of CI-1 and others.

84. Many of the electronic devices seized during the July 25, 2018, searches were also searched pursuant to federal warrants. A review of the computers and other electronic devices

seized from the various co-conspirators, including Sydney Malkin, Robert Malkin, and Lev Reys revealed the use of those devices in furtherance of the conspiracies.

85.     Specifically, an analysis of these items revealed documents related to property purchases, online banking transfers of suspected proceeds, emails between coconspirators regarding travel associated with the various cities connected to the drug trafficking organization, including the booking of airfares, rental cars, credit card expenses and payments, and the rental and payment of stash locations in Milwaukee, Wisconsin, and various cities in Maryland. The emailed communications included contact between Dusi and Sydney Malkin related to the residence at 2624 Monterey Drive. Authorities located documents saved on Sydney Malkin's computer drive regarding 432 Lucy Drive, a residence owned by Dusi, and documents related to the purchase of the subject premise, 2624 Monterey Drive.

86.     The drug trafficking activities involving some of these individuals was traced back to as early as 1998.

87.     On January 1, 1998, $53,590 in currency was seized from Dusi on an Amtrak train while traveling from Pittsburgh to Los Angeles.

88.     On or about October 12, 2016, $88,230 in cash was seized from a package interdicted in Indiana. The package was sent from Dusi to Robert Malkin. Copies of the Indiana federal court civil forfeiture paperwork was recovered from Malkin's residence during the July 2018 search warrant execution. Based upon subpoenaed airline and rental car records received, immediately thereafter on October 16, 2016, Robert Malkin traveled from Los Angeles to Pittsburgh. On October 21, 2016, Malkin returned from Pittsburgh to Los Angeles.

89.    In 2005, Dusi was convicted for the felony offense of marijuana trafficking in Missouri. Dusi received a sentence of five years' probation, and was released from probation on September 14, 2010.

90.    In 2013 and 2014, the United States Postal Service seized and forfeited parcels being mailed from Robert Malkin to his wife, Susan Malkin, which contained large sums of currency. In 2013, $25,000 was seized, and in 2014, two additional parcels containing over $149,000 in currency were seized. Based on a civil forfeiture complaint filed in U.S. District Court, Central District of California, in July 2014, the 2014 parcels were shipped by Robert Malkin in Clairton, Pennsylvania to Susan Malkin, to a UPS store in Ventura, California. The telephone number used by Robert Malkin on the parcel mailing in 2014 was 805-279-5393.

91.    In 2016, Jacobs was named in a DEA investigation when Jacobs had $29,950 of suspected drug proceeds seized from him at Dulles airport.

92.    Robert Malkin operates Malkin Properties LLC, and Robert K. Malkin & Associates, and database checks reveal that Malkin manages and sells properties under these business names in the southern California and Pittsburgh, Pennsylvania areas. The business entities have periodically used an address in Ojai, California.

93.    Sydney Malkin is the Chief Executive Officer of Malkin Properties, Inc. and Malkin Properties, LLC. Subpoenaed records and information obtained via search warrants including documents, text messages, and emails reveal that while Robert Malkin was the financier of the DTO, Sydney Malkin managed the finances of the DTO just as she managed the finances of the other business entities. She was responsible for establishing stash locations in Milwaukee and Maryland, and she orchestrated the payment of expenses for the DTO's operation via currency or money orders (while paying legitimate business expenses with checks). DTO related documents

were found in Sydney Malkin's residence during the July 2018 search, which included various lease documents for the various stash house rentals, money order receipts paying DTO expenses, and documents related to the transportation of marijuana and drug proceeds between the west and east coasts, i.e., purchase contract for a semi-trailer, lease of parking/storage space, receipts of payments to trucking companies, etc.

94. The most recent residence associated with Dusi and Coleman is at 2624 Monterey Dr., Pittsburgh, Pennsylvania. They are first associated with the property in February 2016. Databases reveal that this property was purchased by Robert Malkin on or about December 14, 2013 at a cost of $285,000. However, Allegheny County real estate records indicate the property was purchased around the time Dusi and Coleman moved in (2016) at a cost of $296,400, which is far more than Robert Malkin paid for any of his other Pittsburgh area properties. This residence was purchased in Robert Malkin's name, whereas, Malkin's other Pittsburgh area properties were purchased in the names of Malkin Properties, LLC and Robert K. Malkin & Associates, Inc.

95. Subpoenaed records of Robert and Sydney Malkin's joint bank accounts fail to reveal deposits of any rent payments from Dusi and/or Coleman related to their living at Robert Malkin's residence. There were monthly payments of $181.50; however, subpoenaed records received from their certified public accountant's tax preparation work papers (2015 through 2017) reveal that these payments were interest payments received from Dusi / Coleman regarding a personal loan. Neither Robert nor Sydney Malkin reported any rental income or expenses for the residence at 2624 Monterey Dr. for any of those tax years.

96. A check through property ownership databases and subpoenaed records revealed that Lev Reys purchased four properties in Pittsburgh, Pennsylvania in June and July 2015, three from Robert Malkin and one from his son Andrew Malkin.

24

97.     Database checks on the address history of Dusi and Coleman revealed that the first address associated to Dusi was an address in Clairton, Pennsylvania in 1994. (Note that this was the city Robert Malkin used on the parcel seizure shipped to his wife Susan Malkin in 2014.)

98.     Dusi was associated with addresses in Ojai, California between 1999 and 2007. Chelsea Coleman first was associated with an address in Ojai, California in 2003 and appears to have lived with Dusi since that time. From 2007 until the present, Dusi and Coleman are associated with addresses in the Pittsburgh Pennsylvania area. It was during this period, 2005, that Dusi was convicted in Missouri for attempting to distribute marijuana.

99.     Allegheny County real estate records reveal that Jonah Dusi purchased 432 Lucy Dr. in Pittsburgh, PA on April 23, 2009 at a cost of $104,900, with a mortgage of more than $102,000. Dusi is still shown as being associated with this property as late as January 2019.

100.    From 2016 to the present, Dusi and Coleman are associated with the residence at 2624 Monterey Dr., Pittsburgh.

101.    A review of online social media revealed Dusi posting that Dusi and Coleman are engaged to be married since 2018.

102.    Additional subpoenaed records received on April 16, 2019, revealed that the cellular telephone number identified as used by Dusi, 412-316-6696, was still active and in the name of Chelsea Coleman with a listed address of 2624 Monterey Dr., Pittsburgh, PA. A second number on the account under Coleman's name lists phone number 412-316-6800, and the toll records revealed that this cellular telephone number has a continuing high volume of calls with the cellular telephone number of Dusi.

103.    Subpoenaed records received from West Penn Power Company revealed that the subscriber for utilities at 2624 Monterey Dr., Pittsburgh, Pennsylvania, has been Chelsea Coleman,

since March 24, 2016, with a listed telephone number of 412-316-6800. The customer contact listed is Jonah Dusi. A source of payment included in the records is a copy of a PNC Bank check dated January 5, 2019, in both the names Jonah Dusi and Chelsea Erin Coleman, 2624 Monterey Dr., Pittsburgh, PA.

104. The account number for the check written to West Penn Power, ending in *5208, was the same account number for which records had been received from PNC Bank and as previously noted, showed a large continuing yearly increase in cash deposits starting in 2016 as enumerated in paragraph 125(b).

## B. Charges and April 2019 Arrests.

105. On August 7, 2018, a grand jury sitting in the Eastern District of Wisconsin returned a superseding indictment charging several defendants, Robert K. Malkin, Jason J. Malkin, Lev B. Reys, Fredric H. Birault, Scott A. Jungwirth, Seth C. Jacobs, Alae Arhi, Nahom Hagos, Mohammed E. Omar, Josef K. Habib and others, with conspiracy to possess with intent to distribute and to distribute marijuana, in violation of Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(B), and money laundering, in violation of Title 18, United States Code, Section 1956(h). As alleged in the indictment by the grand jury, the charged conspiracy began at least in or around 2016, and continued up to and including January 8, 2018.

106. On April 16, 2019, a grand jury sitting in the Eastern District of Wisconsin returned a sealed indictment charging several other coconspirator defendants, Sydney A. Malkin, Jonah M. Dusi, and Benjamin D. Rubin with conspiracy to possess with intent to distribute and to distribute marijuana, in violation of Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(B), and Sydney A. Malkin with money laundering, in violation of Title 18, United States Code, Section 1956(h).

107. Subsequent to the indictment of Dusi, Rubin, and Sydney Malkin on April 16, 2019, arrest warrants were obtained. Law enforcement arrested the subjects on April 30, 2019.

108. A search warrant, signed by the Honorable Magistrate Judge Maureen Kelly of the U.S. District Court, Western District of Pennsylvania, was executed on April 30, 2019 at Dusi's residence at 2624 Monterey Dr., Pittsburgh. Items seized during the search of the residence included approximately 5 pounds of processed marijuana, in excess of $20,000 in currency, documents, and **Devices A – I**.

109. In a post Mirandized statement, **Dusi** provided a statement and stated his role in the Malkin DTO was as a distributor in the Pittsburgh, Pennsylvania area and as a transporter of shipments of marijuana from locations in Maryland to other locations in Virginia, Washington D.C., and Pittsburgh. Dusi stated he had assisted in loading the semi trailers with money for return to California and assisting in the construction of the hidden compartments within the semi trailers. Dusi still had contact with Sydney Malkin regarding the property he resided at, which was owned by Robert Malkin, and Dusi stated that he made rent payment arrangements through Sydney Malkin.

112. Also during the week of April 29, 2019, S/A Novak interviewed a confidential citizen witness, who stated that he / she had weekly contact with Sydney Malkin related to 20 properties that either Robert Malkin or Sydney Malkin owned in the greater Pittsburgh, Pennsylvania area.

113. Law enforcement is aware that Robert Malkin has purchased numerous properties in the Pittsburgh, PA area, some of which were then sold to coconspirators and / or utilized as stash location for the DTO.

27

## C.    Travel, Financial, Freight, and Cellular Telephone Data Corroborate Historical Drug Trafficking & Money Laundering Evidence.

114.    Malkin purchased a property at 840 Maple Lane in Garberville, CA in the name of Robert K. Malkin & Associates, Inc. Psp on or about May 23, 2017 for $220,000. No mortgage was located for the property. Reys has traveled to Garberville on at least three occasions; i.e., September 15, 2017, September 24, 2017, and October 6, 2017, as per his credit card transactions. A review of records also revealed that co-conspirators Jason Malkin and Scott Jungwirth have traveled to Garberville.

115.    CI-2 identified the property in Garberville as a stash and repackaging location for the shipments of marijuana obtained by the DTO in northern California.

116.    Members of the DTO have extensive documented travel to and between Los Angeles, San Francisco, Sacramento, and Garberville, CA; Milwaukee, Wisconsin; Chicago, Illinois; Pittsburgh, Pennsylvania; and Maryland and Washington, D.C. The DTO members' travel in furtherance of the conspiracy to obtain and distribute the shipments of marijuana and proceeds of the trafficking is corroborated by flight, rental car, financial account, and cellular call and location data.

117.    I am aware that travel to San Francisco is consistent with the last major airport in closest proximity to the Garberville / Humboldt County area of northern California, and that Sacramento, California is known as a major trucking / shipping location for shipments of marijuana emanating from Northern California.

118.    Subpoenaed bank and other financial account records revealed that Robert Malkin established a credit card through Capital One Bank for use by Jason Malkin and Scott Jungwirth to cover expenses associated with the marijuana distribution activities, i.e., Bob Malkin appears to

be the primary account holder, with Jason Malkin and Scott Jungwirth being authorized users on the account.

119. Consistent with other financial transactions conducted by members of the DTO, the payments against the account balances were made with currency equivalents; i.e., money orders, whose purchases appear to have periodically been structured to avoid the need to provide identification to the seller of the money orders. Many of the monthly statements for this Capitol One credit card account were seized from Sydney Malkin's residence/office in July 2018. Attached to the statements were the receipts from the money orders used to pay the balances due on the statements.

120. Jason Malkin incurred travel expenses associated with cities of Garberville, California; Milwaukee, Wisconsin; Pittsburgh, Pennsylvania; Germantown, Maryland; etc. These expenses were most prevalent from September 2016 through July 2017, but others existed.

121. Scott Jungwirth initially incurred expenses associated with Redding and Garberville, California; however, he began incurring more expenditures associated with Maryland beginning in August 2017. Some of his expenditures include large-value vehicle rentals, consistent with driving across the country.

122. These credit card expenditures became minimal beginning in January 2018.

123. A review of Robert Malkin's Chase Bank checking account *0404 revealed the following:

a. Six checks, made payable to World-Wide Freight, 2115 Stein Dr. Suite 304 Chattanooga, Tennessee were drawn against Robert MALKIN's account # 0404. These checks were dated from December 2, 2015 through July 13, 2017, and ranged in amounts from $3,900 to $4,900. The Memo section on check number 9775, dated August 2, 2016, states "COD Payment –

29

Santa Paula CA – Maryland." (Note: Lev REYS' telephone tolls reveal that Reys was in contact with 423-760-4300, listing to Worldwide Freight's Carrier Division, 2115 Stein Dr. Suite 304 Chattanooga, TN.)

124.    A review of Lev Reys Citibank checking account *4331 revealed the following:

a.    Checking account *4331 revealed three money order deposits in 2015 totaling $3,000, two in 2016 totaling $5,600, and 50 in 2017 totaling $47,015. Of the 50 in 2017, three listed the alleged purchaser as "Robert Malcom" totaling $2,800 and ten with "Rohert / Boh Malkin" totaling $9,800.

b.    Deposited items into the checking account included six deposits totaling $39,890 between February 2015 and October 2017 from businesses owned by Robert Malkin (Fresno Valley Partners LLC, Robert K. Malkin & Associates, Inc., and Malkin Properties, LLC) with the largest deposit being $35,000 on May 28, 2016.

c.    Withdrawals from the checking account included ten totaling $91,682.02 between June 2015 and September 2017, payable to businesses of Robert Malkin (Malkin Properties, Robert K. Malkin & Associates, Inc., Malkin Properties, Inc.) and one to Malkin's son Andrew Malkin.

d.    Nearly all of these transactions between Reys and the business of Robert Malkin were associated with real properties in the Pittsburgh, PA area. The four transactions taking place on or about June 8, 2015 indicate that Reys purchased four real properties from the Malkins at a cost of approximately $88,000. These transactions were preceded by two currency deposits of $4,000 each and a $10,000 "loan" from Alice Reys.

125.    A review of Lev Reys' Citibank credit card *2764 transactions also showed multiple travels related to this marijuana trafficking conspiracy between September and November

30

2017 to San Francisco and Garberville, California; Milwaukee, Wisconsin; Baltimore and Hagerstown, Maryland; and Pittsburg, Pennsylvania.

126. A review of Seth Jacobs PNC Bank checking account revealed the following:

a. The vast majority of the deposits made in the years 2015, 2016, and 2017 consisted of currency and were made via Automated Teller Machines (ATM).

b. Multiple deposits were frequently made on the same day. For example: On August 9, 2015, sixteen deposits totaling $4,731 were made into Seth Jacobs' account. The deposit amounts ranged from $70 to $780.

c. Larger deposit amounts often correlated with the purchases of multiple airline tickets (usually to northern California), hotel costs, and vehicle rentals.

d. The six largest deposit amounts were accompanied with currency withdrawals of the same amount. These transactions are indicative of exchanging currency for different denominations or for cashing currency equivalent items; i.e., cashier's check or money order, then depositing the proceeds. For example, on June 5, 2017, a $2,100 currency deposit was made at PNC Bank's Bethesda, Maryland branch. On that same date, a withdrawal of $2,100 was also made. Handwritten on the back of the withdrawal ticket were the words, "Remitter: Rohert Malkin," which likely indicates the cashing of a currency equivalent item, such as a cashier's check, purchased on behalf of the remitter, Robert Malkin.

e. The amount of currency deposited into Jacobs' checking account increased dramatically in 2015, rising from $1,196 in 2014 to $77,989 in 2015. The amount of currency deposits increased again in 2016, to $84,171. However, the amount of currency deposited during the first nine months of 2017 dropped to $48,733.

31

f. Four United Airline ticket expenditures were made on January 7, 2016. A $600 deposit was made into Jacobs' account at a branch in Pittsburgh, Pennsylvania on January 15, 2016. And, Hyatt House of Pittsburgh, Pennsylvania expenditures were recorded on January 19, 2016. American Airline ticket records reveal that Robert Malkin flew into Pittsburgh on January 14, 2016 and departed from Pittsburgh on January 17, 2016.

g. Less than one month later; i.e., on February 9, 2016, Jacobs' checking account incurred its first expenditure from Germantown, Maryland. This was a $31.30 charge at the Target store. Beginning on February 23, 2016, multiple currency deposits began being made in Germantown, Maryland. In fact, Germantown became the primary location for deposits into Jacobs' account through the end of 2016 and trips to northern California continued through 2016.

127. Subpoenaed records from PNC Bank of Dusi's bank account ending in *5208 revealed the following:

a. Dusi appears to have stopped his employment with Nello Construction in mid-2016. (During the post Mirandized statement provided by Dusi to law enforcement on April 30, 2019 Dusi stated he began employment with Nello construction in August 2018 after the arrests of the various co-conspirators).

b. Thereafter, the amounts of cash deposited into his account rose dramatically in 2017 and the first part of 2018, with yearly totals being: 2014 – $5,940, 2015 - $10,960, 2016 - $16,910, 2017 - $44,140, 2018 - $12,860 through April 22, 2018.

128. Dusi further conducted financial transactions in a manner consistent with other DTO members, i.e., using currency and money orders. For example, between June 29, 2017 and July 28, 2018, Dusi obtained ten United States Postal Service and MoneyGram money orders totaling $8,227.88 and listed himself as the remitter to pay his JPMorgan Chase Bank credit card

32

ending in *5076. Between December 11, 2015 and March 9, 2016, eleven additional money orders were purchased, totaling $10,400, and made payable to Barclays at seven different post offices in Pittsburgh, PA and New York. Dusi was identified as one of the money order purchasers.

129.    A review of received subpoenaed airline flight records and rental vehicle records to locations related to the locations noted revealed that from approximately 2015 to 2017, DTO members flew at least approximately 83 times to locations known to serve and facilitate their drug-trafficking activities, i.e., San Francisco and Redding, California; Milwaukee, Wisconsin; Washington D.C.; and Baltimore, Maryland. Notably, many of their identified flights did not have corresponding outbound or inbound flights. Moreover, Jacobs paid for approximately 18 of Habib's flights, flying with Habib 15 times in 2015 and 2016.

        a.    It is noted that the airports in Washington D.C. and Baltimore, Maryland are the same proximate distance from the stash house in Germantown, Maryland and the warehouse hangar in Hagerstown, Maryland. CI-1 also advised that the defendants would utilize either airport when they traveled to Maryland.

130.    Similarly, rental vehicle records obtained revealed that from 2015-2017, DTO members had at least approximately 72 vehicle rentals with rental or drop-offs in known DTO-related locations, i.e., San Francisco, Sacramento, and Redding, CA; Milwaukee, WI; Baltimore, MD; Washington D.C.; and Pittsburgh, PA.

131.    Credit card (including Robert Malkin's card issued to Jason Malkin), car rental, and airline records reflect that DTO members, particularly Robert Malkin, Jason Malkin, Lev Reys, Seth Jacobs, and Joseph Habib, coordinated travel to northern California; Milwaukee, Wisconsin; Germantown, Maryland; and Pittsburgh, Pennsylvania.

132.     The charge card accounts and airline records clearly show a pattern in 2017 of Robert and Jason Malkin travels overlapping with believed shipments of marijuana from California to Milwaukee and Maryland and arrangements with Reys and Habib to establish the stash locations in Milwaukee, Wisconsin, Germantown and Hagerstown, Maryland areas.

133.     A review of records received from various freight carriers as of this date used by the DTO show multiple charges for semi-trailer hauling from 2014 through 2017 between California and Pittsburgh, PA, and California and Coraopolis, PA.

134.     Numerous cellular telephone call records and data have been reviewed and analyzed, which revealed cellular telephone numbers for Robert Malkin, Dusi, Rubin, Jason Malkin, Reys, Birault, Jungwirth, Omar, Jacobs and Hagos.

135.     A review of telephone toll and pen register / trap and trace data from identified telephone numbers has revealed varied volume of contacts between the defendants during 2017 and 2018. Lower call volume is consistent with use of multiple cellphones and use of Telegram application.

136.     Toll records (not including Telegram application calls) reveal calls between Dusi (412-316-6966) and Robert Malkin dating back to at least January 10, 2014. Between April 28, 2017 and July 17, 2018, 31 calls between Dusi and Robert Malkin exist. Dusi also had contact with Jason Malkin (dating back to February 16, 2017) and Scott Jungwirth (dating back to August 8, 2017).

137.     Based upon the facts described above, that there is probable cause to believe that a search of the information contained within the above described **Devices** will produce evidence of a crime, namely evidence related to the possession and trafficking of marijuana and money laundering; that through affiant's training, experience and discussions with other experienced law

34

enforcement officers, affiant is familiar with the ways in which drug traffickers conduct their unlawful trade, including their methods of distribution, their utilization of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their utilization of various forms of electronic devices to store and/or conceal illegal activity;

138. Based upon my training and experience, affiant knows that individuals involved in drug trafficking and money laundering frequently use cellular telephones to maintain contact with their sources of controlled substances as well as customers and co-conspirators in the distribution of controlled substances; that affiant has also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs; therefore records contained within said Devices will provide evidence related to the identity of said supplier(s), co-conspirators, and customers;

139. Based upon my training and experience, affiant believes it is common for crime suspects who possess illegal narcotics to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal narcotics that they control, possess, buy, and sell; furthermore, affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular devices.

140. The **Devices** were seized during the execution of a warrant and are currently in the lawful possession of the Wisconsin Department of Justice, Division of Criminal Investigations (DCI).

141. The **Devices** are currently in storage at 633 W. Wisconsin Ave., Suite 803 Milwaukee, Wisconsin 53203. In my training and experience, I know that the **Devices** have been

stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Devices** first came into the possession of the Wisconsin Department of Justice, DCI.

## TECHNICAL TERMS

142.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard

36

drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer

programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

143.    Based on my training, experience, and research, I know that the **Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

144.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Device. This information can sometimes be recovered with forensics tools.

145.    There is probable cause to believe that things that were once stored on the **Devices** may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

39

b.　　　Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.　　　Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.　　　Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

146.　*Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Devices** were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Devices** because:

a.　　　Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.　Web browsers, e-mail programs, and chat programs store configuration

information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

147. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Device** consistent

with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

148. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

149. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Devices** described in Attachment A to seek the items described in Attachment B.

## ATTACHMENT A

The property to be searched is described as follows:

a. An Apple iPhone with silver back in a brown plastic case, hereinafter "**Device A**";

b. An Apple iPhone with white face and rose-colored back with partially cracked screen, hereinafter "**Device B**";

c. An Apple iPhone with silver back, hereinafter "**Device C**";

d. An Apple iPhone with white face, pink-colored back in a brown plastic case, hereinafter "**Device D**";

e. An Apple iPhone with red back in a black plastic case, hereinafter "**Device E**";

f. An Apple iPhone in orange/pink case with cracked screen, hereinafter "**Device F**";

g. A Black Dell Inspiron laptop, Model PP41L, Serial Number 7DR12K1, hereinafter "**Device G**";

h. A Seagate portable external hard drive, Serial Number NA8JF50F, hereinafter "**Device H**"; and

i. A white Apple iPad, hereinafter "**Device I**."

**Devices A**, **B**, **C**, **D**, **E**, **F**, **G**, **H**, and **I**, collectively the "**Devices**," are currently located at

633 W. Wisconsin Avenue, Suite 803, Milwaukee, Wisconsin, 53203.

This warrant authorizes the forensic examination of the **Devices** for the purpose of

identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the **Devices** described in Attachment A that relate to violations of

21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. §1956(h), including, but not limited to:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and
   amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone
   numbers, or any other identifying information);

   d. any information recording schedules or travel;

   e. all bank records, checks, credit card bills, account information, and other financial
   records.

   f. Photographs and/or video depicting possession of drugs; and

2. Evidence of user attribution showing who used or owned the **Devices** at the time

the things described in this warrant were created, edited, or deleted, such as logs, phonebooks,

saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.